# United States Court of Appeals

## For the First Circuit

No. 10-1062

UNITED STATES OF AMERICA,

Appellee,

v.

JOHNNY PIRES,

Defendant, Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Judith H. Mizner, Assistant Federal Public Defender, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

April 6, 2011

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SELYA**, <u>Circuit Judge</u>. In this appeal, which follows a conviction for attempted receipt and possession of child pornography, defendant-appellant Johnny Pires claims (i) insufficiency of evidence; (ii) error in the exclusion of proffered expert testimony; (iii) prosecutorial misconduct; and (iv) multiplicity of charges.

After careful consideration, we find none of these claims persuasive and, accordingly, affirm the judgment of the district court.

## I. BACKGROUND

On March 19, 2008, a federal grand jury sitting in the District of Massachusetts returned an indictment that charged the appellant with two counts of attempted receipt of child pornography, 18 U.S.C. § 2252(a)(2), (b)(1), and one count of knowing possession of child pornography, <u>id.</u> § 2252(a)(4)(B). We rehearse the relevant facts through the prism of the ensuing trial.

The government's case relied in large part on testimony from agents of the Federal Bureau of Investigation (FBI). Byron Mitchell, a member of the FBI's cyber crime unit, related that, on December 19, 2006, he mounted an online undercover investigation. To that end, he availed himself of LimeWire, a commercially available peer-to-peer networking program that allows file-sharing between unrelated computers. He entered a search term ("Lolita") that he knew to be favored by individuals who fancied child

pornography. His query returned a number of files available for download, each associated with a particular Internet protocol (IP) address.

Because some of the file names were suggestive of child pornography, Mitchell activated LimeWire's "browse the host" function, which allowed him to view all of the files available for download from a particular user's "shared files" folder. Several of the revealed files contained words that Mitchell, an experienced agent, knew to be associated with child pornography. He downloaded a number of those files from that user's folder and confirmed that some appeared to contain child pornography. He then traced the associated IP address directly to the appellant.

At that point, another FBI agent, Sarah De Lair, took charge. After performing some preliminary investigation of her own, she obtained a search warrant for the appellant's home. On April 10, 2007, De Lair, accompanied by other law enforcement personnel, executed the warrant.

De Lair testified that when she knocked on the door, identified herself, and announced that she had a search warrant, the appellant permitted entry. Following a protective sweep, De Lair and another FBI agent, Bryan Zinn, conversed with the appellant. De Lair explained that the agents would be searching the premises for evidence of child pornography and advised the appellant of his <u>Miranda</u> rights. <u>See</u> <u>Miranda</u> v. <u>Arizona</u>, 384 U.S.

436, 444 (1966). The appellant replied that he understood his rights and signed a written waiver to that effect.

De Lair proceeded to question the appellant. The interview was not recorded, nor was the appellant ever asked to sign a written statement. The agents' version of the interview follows.

The appellant told De Lair that he, his sister, and his fiancée all used the computers that were on the premises and that these computers held a goodly amount of child pornography (at least 15 files). He initially stated that he did not intentionally download any child pornography. He acknowledged, however, that he had opened suspiciously titled files obtained through LimeWire because he was curious about whether the file names reflected the actual contents of the files.

He claimed that he had used the LimeWire program to search for images of the World Trade Center. After downloading some such images, he clicked on a link entitled "Vicki willing" and watched a video of a young girl, eight to nine years of age, who was naked and engaged in a sexual act with an adult. The girl, he observed, was "not doing anything good." The appellant estimated that he saw approximately five videos related to "Vicki willing."

In the course of the interview, the appellant admitted to using search terms such as "Lolita" and "young preteen." He also admitted that those searches yielded files that depicted

-4-

prepubescent children, approximately seven or eight years old, "not doing anything good." He acknowledged that he knew children were involved in child pornography and that he could tell if someone was less than 17 years of age. When De Lair showed him the titles of the two files containing child pornography that Agent Mitchell had downloaded and descriptions of their contents, the appellant stated that he recognized the titles but not the descriptions. Queried about whether he was "attracted" to child pornography, the appellant said that he was uncomfortable with the term "attracted" but admitted that he had been "interested" in child pornography (specifically, images depicting seven-to-ten-year-old children) for at least a year. Elaborating on this point, he noted that he looked at pornographic images of children three or four times per week and that he downloaded five to six such images once or twice per week.

As fruits of the search, the agents seized two computers. A forensic examination of one computer's hard drive revealed, among other files containing child pornography in the appellant's LimeWire shared files folder, the two videos that Agent Mitchell had downloaded. These two video files, each of which forms the basis for a separate count in the indictment, bore a creation date of October 21, 2006.

Nearly a year after the search, Agent De Lair tried to interview the appellant's sister at the sister's residence. By

happenstance, she encountered the appellant, who told her that if he had known either that it was wrong or that anyone was watching, he would not have downloaded the files. Later, he left a voice message for De Lair, in which he indicated that he had made a mistake by having the materials on his computer. The government introduced a recording of this voice message at trial.

The appellant testified in his own defense. His account of these interactions diverged from the agents' accounts in some respects. We summarize portions of his version of what he told the agents.

The appellant maintained that he had used LimeWire to search for adult pornography and sometimes would (inadvertently) come across child pornography. If he opened a video that turned out to be child pornography, he would click out of it. While he admitted using search terms like "Lolita," he did not understand them to be associated with child pornography. He viewed the video entitled "Vicki willing" and clicked out of it. He did not, however, delete it. He never searched for child pornography or intentionally downloaded any child pornography.

The appellant did admit to having told the agents that there was child pornography on his computer, but explained that there were also other items on the computer that he did not want and had not sought. He denied having said that he was interested in child pornography. He had used LimeWire for only about a year,

three or four times a week, and would download five or six "search terms" per week,[1] but without any intention of searching for, or downloading, child pornography. He denied having told Agent De Lair that he would not have downloaded the images in question had he known either that it was wrong or that someone was watching. Finally, he tried to explain away the "mistake" voicemail; he had meant to say "I made a mistake by having the child pornography on the computer, but not intentionally."

Faced with this chiaroscuro record, the jury found the appellant guilty of one count of attempted receipt of child pornography (count two) and one count of possession of child pornography (count three), and acquitted him on the other attempted receipt count (count one). Prior to the submission of the case to the jury, the appellant had moved for a judgment of acquittal as to count two. See Fed. R. Crim. P. 29(a). He renewed that motion post-verdict, see Fed. R. Crim. P. 29(c), and he simultaneously moved for a new trial, see Fed. R. Crim. P. 33(a). The district court denied both motions, and on January 6, 2010, sentenced the appellant to a five-year incarcerative term. This timely appeal followed.

## II.  ANALYSIS

The appellant has briefed four claims of error. For ease

---

[1] Although this phraseology seems odd, we think that the jury reasonably could have inferred from it that the appellant downloaded the results of five or six searches each week.

in exposition, we divide our analysis into segments that correspond to these claims.  We start with the one claim that seeks acquittal and then assay the three claims that seek the granting of a new trial.

### A.  **Sufficiency of the Evidence**.

The appellant contends that, as to count two, the evidence was insufficient to prove the offense's knowledge and interstate commerce elements.  We address these contentions sequentially.  First, however, we rehearse the standard of review.

We assess preserved challenges to evidentiary sufficiency de novo, considering the evidence in the light most agreeable to the verdict.  United States v. Rodríguez-Vélez, 597 F.3d 32, 38 (1st Cir. 2010).  Our appraisal is aimed at determining whether on this view of the record a reasonable juror could conclude that the government proved each element of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Troy, 618 F.3d 27, 31 (1st Cir. 2010).

1.  **Knowledge**.  The appellant contends that the government failed to introduce evidence sufficient to establish that he knew, when he received the relevant video file, that it depicted real minors engaged in sexually explicit conduct.  This contention operates at three different but overlapping levels.

First, the appellant tries to engraft an extra layer of mens rea onto the offense.  In his view, the government, by

charging that he "knowingly attempted to receive" the images, had to prove that he knew the character of the material at the very moment of its acquisition. He insists that when he downloaded the file, he was aware only of its title, and he refers to testimony presented at trial for the proposition that titles do not always reliably indicate a file's actual contents. The appellant believes that this testimony demonstrates that he could not have known the video's actual contents on the basis of its name alone and therefore could not knowingly have attempted to receive it.

This argument is belied by the language of section 2252(a)(2), which criminalizes the knowing receipt of child pornography. We simply do not see how incorporating the statutory language into the charging document could have elevated the necessary proof beyond the elements required by the statute itself.

This brings us to the second level of the argument. To prove attempt, the government must show both that the accused intended to commit the underlying substantive offense (here, knowing receipt of child pornography) and that he took a substantial step toward committing that crime. United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006). But this does not mean that the government bore a burden to prove each element of the underlying offense. While the underlying offense in this case requires the receipt of images of real-life minors engaged in sexually explicit conduct, see United States v. McNealy, 625 F.3d

858, 870 & nn.47-48 (5th Cir. 2010) (citing United States v. X-Citement Video, Inc., 513 U.S. 64, 78 (1994)), the government in an "attempt" case has no burden to prove that the appellant knew that the downloaded file actually contained such images. Rather, the government is required to prove that the appellant believed that the received file contained such images. See United States v. Bauer, 626 F.3d 1004, 1008 (8th Cir. 2010). No other view of the relevant threshold of proof comports with the Supreme Court's reasoning in United States v. Williams, 553 U.S. 285 (2008), in which the Court explained that "[t]here is no First Amendment exception from the general principle of criminal law that a person attempting to commit a crime need not be exonerated because he has a mistaken view of the facts." Id. at 304.

The third layer of the appellant's argument rests on the district court's jury instructions. Contrary to what the statute of conviction requires, the court told the jury that "the government has to prove not just that the defendant voluntarily and intentionally, not by mistake, received a depiction, a video, but that he knew at the time of receipt that the production of that video involved the use of a real minor and that the video showed a real minor." This instruction plainly overstates the government's burden.

In circumstances where, as here, a district court overstates the government's burden of proof to the defendant's

-10-

benefit in its charge to the jury, a reviewing court faced with a challenge to the sufficiency of the evidence must measure that challenge against the correct legal standard, not against the erroneous standard set forth in the charge.  See United States v. Bayes, 210 F.3d 64, 69 (1st Cir. 2000).  With the correct standard as our metric, we conclude that the evidence, taken in the light most agreeable to the verdict, is sufficient to ground the conviction.

"[A] showing of scienter . . . can (and often will) be made through circumstantial evidence."  United States v. Hussein, 351 F.3d 9, 20 (1st Cir. 2003).  Here, the jury heard testimony from two FBI agents confirming that, by his own admission, the appellant deliberately used search terms associated with child pornography (such as "Lolita" and "young preteen") when trolling on LimeWire.  This evidence is significant because a defendant's use of search terms associated with child pornography can support a finding that he knew that the images retrieved contained child pornography.  See McNealy, 625 F.3d at 870-71.  Such an inference is strengthened in this case by the appellant's statement to the agents that those searches yielded videos of children, approximately seven or eight years old, "not doing anything good." In addition, the appellant admitted to the agents that he had had an interest in child pornography for about a year and that he had looked at child pornography three or four times a week, downloading

five to six images containing child pornography once or twice a week.  Nor was this all.  The title of the file that underbraced count two was highly suggestive of child pornography.[2]

Taking this tapestry of facts as a whole, we believe that the jury reasonably could have inferred that the appellant, having seen the name of the file, proceeded to download it; and that when he did so, he was seeking to acquire child pornography.  Thus, the evidence supports a finding that the appellant acted "knowingly" with respect to count two.

2.  **Interstate Commerce**.  The appellant's complaint that the government failed to prove the "interstate commerce" element of the offense of conviction — that is, that the video file he attempted to receive traveled in interstate commerce — is squarely foreclosed by circuit precedent.  See United States v. Lewis, 554 F.3d 208 (1st Cir. 2009).  In Lewis, we held that "the government proved the images traveled interstate when it introduced evidence that [the defendant] received images that were transmitted over the Internet."  Id. at 215.  Given that the video file underlying count two in this case was also transmitted over the Internet, the holding in Lewis is of decretory significance.

For the most part, newly constituted panels in a federal

---

[2] The file name was: "cp tvg 13 Bond 10-11-12Yo Childlover Little Collection Video 0039 Girl-Vicky String Bikini Pthc 11Yo Pedofilia.mpg."

appellate court are bound by prior panel decisions closely on point.  Troy, 618 F.3d at 35; United States v. Rodríguez, 527 F.3d 221, 224 (1st Cir. 2008); United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991).  Although this permutation of the doctrine of stare decisis does not constitute an "immutable rule," Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co., 215 F.3d 136, 142 (1st Cir. 2000), it is subject to only a few "narrowly cabined exceptions," Troy, 618 F.3d at 36; San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. 2010).  To be specific, a departure from circuit precedent is warranted only where the previous holding is "contradicted by controlling authority, subsequently announced (say, a decision of the authoring court en banc, a Supreme Court opinion directly on point, or a legislative overruling)," Rodríguez, 527 F.3d at 225, or in "those relatively rare instances in which authority that postdates the original decision, although not directly controlling, nevertheless offers a sound reason for believing that the former panel, in light of fresh developments, would change its collective mind," Williams v. Ashland Eng'g Co., 45 F.3d 588, 592 (1st Cir. 1995).

The appellant offers no serious claim that any of the exceptions to the law of the circuit rule applies.  While he points to United States v. Schaefer, 501 F.3d 1197, 1200-01 (10th Cir. 2007), to suggest that our holding in Lewis is incorrect, the Tenth Circuit's decision in Schaefer predates Lewis.  Consequently, it

-13-

does not trigger any of the isthmian exceptions to the law of the circuit rule.

That ends this aspect of the matter. The holding in Lewis — that evidence showing that images were received via the Internet is sufficient to satisfy the interstate commerce element under 18 U.S.C. § 2252(a)(2) — applies here. Hence, the evidence of the appellant's use of the Internet to procure files via LimeWire is sufficient to ground a finding that the interstate commerce element of the offense was satisfied.

## B. **Exclusion of Expert Testimony**.

During pretrial proceedings, the government moved to exclude certain expert testimony that the appellant proposed to present at trial. This testimony was to come from a forensic psychologist, Dr. Carol Ball. Her report stated in pertinent part that the appellant was "free of major mental illness, antisocial personality traits, and sexual deviance" and was "not a pedophile or sexual psychopath." The parties sharply disagreed about the admissibility of this testimony: the appellant asserted that it was relevant because it "demonstrates the absence of motive for the alleged crimes"; the government asserted that it was not relevant to any element of the charged crimes. The district court found that the proffered testimony might be relevant but that its relevance was "outweighed by the danger of confusion of the issues or misleading the jury." Citing Federal Rule of Evidence 403, the

-14-

court granted the motion in limine.  It later denied a motion for reconsideration.  The appellant assigns error to the exclusion of this testimony.

We review a trial court's decision to exclude evidence for abuse of discretion.  United States v. Stierhoff, 549 F.3d 19, 27 (1st Cir. 2008); United States v. Zaccaria, 240 F.3d 75, 78 (1st Cir. 2001).  This deferential standard normally precludes us from substituting our judgment for that of the district court absent an obvious mistake.  Torres-Arroyo v. Rullán, 436 F.3d 1, 7 (1st Cir. 2006).  Within this rubric, abstract legal questions are reviewed de novo with the understanding that a material error of law is always an abuse of discretion.  United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998).

In this case the expert witness, Dr. Ball, was prepared to testify that the appellant did not have major mental illness, antisocial personality traits, sexual deviance, or prurient interest in children of any age.  The appellant advances three related objections to the exclusion of her testimony.  He asseverates that the court applied an incorrect legal standard, that it undervalued the probative worth of the proffered evidence while simultaneously overvaluing its potential as a source of jury confusion, and that the order in limine infringed on his constitutionally assured right to present a defense.  We examine each component of this asseverational array.

-15-

1. **<u>Rule 403 Standard</u>**. The appellant's plaint that the district court failed to apply the correct legal standard does not withstand scrutiny. This plaint focuses on language in Rule 403 that states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." The appellant suggests that the district court skewed this standard by considering whether the prejudicial effect of the evidence merely outweighed its probative value, rather than whether the former <u>substantially</u> outweighed the latter. This argument rests almost exclusively on the court's statement, in the order granting the motion in limine, that the evidence's "probative value is outweighed by the danger of confusion of the issues or misleading the jury." To the appellant's way of thinking, the court's failure to use the modifying adverb "substantially" reflects that it applied an incorrect standard.

We disagree. Elsewhere in the same order, the court quoted the pertinent language of Rule 403, correctly describing the "substantially outweighed" benchmark. Nothing in the court's discussion indicates that it ignored that articulated standard when balancing the competing interests and deciding to exclude Dr. Ball's testimony. Where, as here, a court's fidelity to the proper legal standard is fairly discernable from the whole of an order, we will not infer the worst from a misspoken word or misplaced phrase.

See, e.g., United States v. Pelletier, 469 F.3d 194, 204 (1st Cir. 2006); Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1088 (1st Cir. 1993). So long as its overall meaning is clear, each word of a court's decision need not be precise to the point of pedantry.

     **2. Balancing**. We turn next to the appellant's claim that the district court miscalibrated the balance between probative value and potential jury confusion. To begin, evidence that bears on the question of motive ordinarily has some probative value in a criminal case. See, e.g., United States v. MacPherson, 424 F.3d 183, 185 n.2 (2d Cir. 2005); United States v. Smith, 292 F.3d 90, 100 (1st Cir. 2002). The district court recognized this connection, stating that evidence of the appellant's "lack of interest in images of children makes it somewhat less likely that he was searching for child pornography." On the same basis, the proffered testimony had some probative value with respect to the issue of intent. See United States v. Varoudakis, 233 F.3d 113, 120 (1st Cir. 2000) ("[P]roof of motive must be offered to show some other element, for example, . . . the accused's requisite mental state.")

     Here, however, the appropriate analysis is more nuanced. In enacting the federal child pornography statute, Congress proscribed certain conduct without regard to the underlying motive. See United States v. Dyer, 589 F.3d 520, 529 (1st Cir. 2009); United States v. Matthews, 209 F.3d 338, 350-52 (4th Cir. 2000).

-17-

Thus, other courts have upheld evidentiary rulings excluding evidence of lack of motive in cases brought under the statute of conviction. Of particular note is United States v. Wallenfang, 568 F.3d 649 (8th Cir. 2009), in which the Eighth Circuit upheld the exclusion of expert testimony about the defendant's psychosexual proclivities, offered to show lack of motive, because his motive for possessing child pornography was "immaterial and irrelevant" and the relevant inquiry was instead "whether, on their face, [the pictures] appear to be of a sexual character." Id. at 660 (quoting United States v. Kemmerling, 285 F.3d 644, 646 (8th Cir. 2002)).

In this case, the relevant images plainly appeared to be child pornography. Moreover, the appellant admitted possessing them. The key question, then, centered on his intent, that is, whether he knowingly received and possessed them. Under these circumstances, the proffered testimony was of diminished relevance. The district court appears to have appreciated this distinction, noting the likelihood that Dr. Ball's testimony, if admitted, might well "shift attention away from [a] key question — whether defendant had knowledge of the contents of the videos — to a wholly irrelevant one — whether or not he is a pedophile." While the two inquiries are more intertwined than the district court's analysis might suggest, we agree that the proposed testimony was likely to confuse the jury and divert its attention from the central question in the case.

The fact that the excluded evidence took the form of expert testimony figures conspicuously in the decisional calculus. Qualified expert witnesses generally may offer opinion testimony if that testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. But expert testimony remains subject to exclusion under Rule 403. See United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994). Indeed, such evidence presents a special level of complexity in constructing the balance between probative value and unfairly prejudicial effect. This complexity arises out of the concern that, because of an expert's stature qua expert, jurors may assign more weight to expert testimony than it deserves. See United States v. Rodríguez-Berríos, 573 F.3d 55, 72 (1st Cir. 2009). Because such testimony can carry with it an unwarranted "aura of special reliability and trustworthiness," United States v. Fosher, 590 F.2d 381, 383 (1st Cir. 1979), courts must guard against letting it intrude in areas that jurors, by dint of common experience, are uniquely competent to judge without the aid of experts. This concern, where pertinent, should legitimately factor into a trial court's Rule 403 analysis. See, e.g., Montas, 41 F.3d at 784.

So it is here. The intent issue in this case presents the type of judgment that jurors historically have made without the assistance of expert testimony. It follows, we think, that the

-19-

proffered testimony presented a special risk of jury confusion.

In arguing against exclusion, the appellant relies heavily on United States v. Shay, 57 F.3d 126 (1st Cir. 1995), in which we concluded that the district court erred in excluding, under Rule 702, expert testimony from a psychiatrist who was prepared to testify that the defendant suffered from a recognized mental disorder that caused him to tell self-aggrandizing lies in order to place himself at the center of attention. Id. at 129-30, 133-34. But Shay and the case at hand are not fair congeners. First, the court in Shay focused on Rule 702, not Rule 403. Second — and more important — the proffers in the two cases were quite different. In Shay, the expert testimony, if believed, would have exculpated the defendant, conclusively explaining away what appeared to be damning admissions on which the government's case relied. See id. at 133. In this case, however, the proffered expert testimony was much more peripheral; at best, it may have borne on the appellant's lack of motive and thus, indirectly, on the question of whether he had the level of knowledge required by the statute. A jury, accepting everything that Dr. Ball had to say, could very well have convicted the appellant anyway.

"Where (as here) a piece of evidence is determined to be relevant, the district court has wide discretion in steadying the Rule 403 seesaw." Onujiogu v. United States, 817 F.2d 3, 6 (1st Cir. 1987). "Only rarely — and in extraordinarily compelling

circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988). Whether the danger of jury confusion here substantially outweighs the probative value of Dr. Ball's testimony is fairly debatable, but the very closeness of the question favors the district court's reconciliation of the competing centrifugal and centripetal forces. Consequently, this is not one of the rare cases in which appellate intervention is justified. Given the circumstances of this case, the district court's ruling was within the universe of reasonable decisions and, thus, was not an abuse of discretion.

3. **Constitutional Claim**. It is a bedrock principle that a criminal defendant's right "to offer witnesses in his defense is a fundamental component of due process." United States v. Brown, 500 F.3d 48, 57 (1st Cir. 2007) (citing Washington v. Texas, 388 U.S. 14, 19 (1967)). But "the mere assertion of that right does not automatically and inevitably ensure the admissibility of the proffered testimony." Id. (citing Taylor v. Illinois, 484 U.S. 400, 414-15 (1988)). In particular, the right to present a defense does not trump valid rules of evidence.

Here, our conclusion that the district court did not abuse its discretion in excluding the proffered expert testimony undermines the appellant's constitutional claim. This exclusionary

-21-

decision fell within the ambit of discretion afforded under Rule 403. The appellant has not developed any argument that meaningfully distinguishes his constitutional claim from his more generic assertion, previously rejected, that the district court abused its discretion in excluding Dr. Ball's testimony. Nor does he argue that Rule 403 itself offends the Constitution.

To say more about this claim would be supererogatory. We hold, without serious question, that the exclusion of the evidence did not abridge the appellant's constitutional right to present a defense. See Rodríguez-Berríos, 573 F.3d at 72 n.16.

### C. **Prosecutorial Misconduct**.

The appellant argues that prosecutorial misstatements during closing argument entitle him to a new trial. He lodged contemporaneous objections to only two of the statements that he identifies. As to those two statements, our review is de novo. United States v. Ayala-García, 574 F.3d 5, 16 (1st Cir. 2009). The remainder of the statements engender review for plain error. United States v. Sánchez-Berríos, 424 F.3d 65, 73 (1st Cir. 2005). We therefore analyze the statements in two groups.

1. **Preserved Claims**. During the summation, the appellant objected to the following statement by the prosecutor:

> [I]n this case knowing possession is essentially conceded. In the opening statement by defense counsel and in defendant's own words, he told you he knew he had child pornography on his computer.

The appellant protests that this assertion erroneously equates "knowing" in the colloquial sense of "being aware" with the legal definition that applies to the charges brought in this case.

The prosecutor's statement must be evaluated in conjunction with the law applicable to the case. To be found guilty of knowing possession, an individual need only have known that there was child pornography on his computer yet declined to delete it. United States v. Carani, 492 F.3d 867, 875 (7th Cir. 2007). He need not know the material's character at the moment that he downloads it, as long as he thereafter learns its character and nevertheless retains it. Id. Evidence of a defendant's awareness that computer files contain child pornography is adequate to show that he knowingly possessed that material. United States v. Hilton, 257 F.3d 50, 54 (1st Cir. 2001).

In the instant case, the appellant admitted that he was aware that there were files containing child pornography on his computer and that at least some of them had not been deleted. The prosecutor's statement was, therefore, an accurate rendition of both the law and the record. Consequently, the district court did not err in overruling the appellant's objection to it.

The appellant also objected to the prosecutor's assertion that the appellant told the FBI agents "that he viewed five 'Vicki willing' files." He protests that this statement was inconsistent with Agent De Lair's testimony that the appellant had stated that

-23-

"there were approximately five videos associated with the 'Vicki willing' link."  That testimony, the appellant says, did not clearly indicate that he actually viewed the videos.  The appellant's complaint, however, overlooks entirely testimony from Agent Zinn, who stated that the appellant "estimated that he <u>saw</u> about — approximately five videos that were related to 'Vicki willing.'"  Agent Zinn's testimony made multiple references to videos and images that the appellant told him that he "saw" and included descriptions of the contents of these files, indicating that the appellant had actually viewed them.  The prosecutor's statement regarding the "Vicki" videos was thus a fair characterization of the agents' testimony, taken in context.

Viewed against this backdrop, the appellant's objection was appropriately overruled.

**2.  <u>Unpreserved Claims</u>**.  We can deal swiftly with the remainder of the challenged statements (which we review only for plain error).  To establish plain error, an appellant must make four showings: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  <u>United States</u> v. <u>Duarte</u>, 246 F.3d 56, 60 (1st Cir. 2001).  He must satisfy all of these requirements in order to obtain relief.  <u>Sánchez-Berríos</u>, 424 F.3d at 73.  This is a daunting standard: "under plain error

-24-

review, we have leeway to correct only the most egregious of unpreserved errors." Id.

When determining whether alleged prosecutorial misstatements sink to the level of plain error, we evaluate the statements within the context of the case as a whole. United States v. Morales-Cartagena, 987 F.2d 849, 854 (1st Cir. 1993). We will intervene only if a statement "so poisoned the well that the trial's outcome was likely affected." United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995) (quoting United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)). "We are guided in making this determination by a number of factors, including the frequency and deliberateness of the prosecutor's comments, the strength and clarity of the trial judge's instructions, and the strength of the government's case against the defendant." Morales-Cartagena, 987 F.2d at 854.

We need not recount in detail the statements about which the appellant now complains. For present purposes, it suffices to say that we have reviewed each of them in the context of the record as a whole. Most involve instances in which the prosecutor asked jurors to draw inferences from the evidence. It is eminently proper for a prosecutor — like any other lawyer — to attempt to persuade the jury to draw reasonable inferences favorable to her case. United States v. O'Shea, 426 F.3d 475, 485 (1st Cir. 2005); United States v. Hamie, 165 F.3d 80, 84 (1st Cir. 1999). With one

possible exception, the challenged statements fell within this safe harbor.

The only statement that requires specific comment involves a misquotation of the appellant's voicemail message. The prosecutor told the jury that in this message the appellant said, "I got caught. I'm sorry." Those precise words were never spoken. At best the prosecutor's account was a rough paraphrase of what the appellant had said.

There is nothing in the record, however, to indicate that this misquotation was deliberate. Moreover, the likelihood of harm was minuscule. A recording of the voicemail message was introduced into evidence, and the jury took it into the jury room. This is particularly important because the court instructed the jurors that the statements of counsel were not evidence but, rather, that their recollection of the evidence, not the lawyers' recollections, should control. We have noted before, and today reaffirm, that such a prophylactic instruction is a significant safeguard against an advocate's tendency to confuse what a witness actually said with what he wished the witness had said. See, e.g., United States v. Ortiz, 447 F.3d 28, 36 (1st Cir. 2006); Morales-Cartagena, 987 F.2d at 855.

In the circumstances of this case, we discern nothing approximating plain error. There is no realistic possibility that this isolated comment made the slightest difference in the outcome.

### D. **Multiplicity**.

Finally, the appellant posits that he is entitled to a new trial on count two because counts one and two of the indictment were multiplicitous.  Specifically, he says that the government failed to offer evidence to show that the two video files alleged to have been received on or about October 21, 2006 (each of which was the basis of a discrete count) were downloaded in separate and distinct transactions.  Assuming for argument's sake that this challenge remains open,[3] it fails on the merits.

"A district court's disposition of a Rule 33 motion for a new trial in a criminal case is ordinarily a 'judgment call.'" United States v. Connolly, 504 F.3d 206, 211 (1st Cir. 2007) (quoting United States v. Maldonado-Rivera, 489 F.3d 60, 65 (1st Cir. 2007)).  Such a ruling engenders review for abuse of discretion.  Id.  Here, however, the appellant's thesis depends on an abstract question of law, which we review de novo.  See United States v. Huddleston, 194 F.3d 214, 218 (1st Cir. 1999); see also Snyder, 136 F.3d at 67.

The rule against multiplicitous prosecutions is grounded in the Double Jeopardy Clause, which "protects against multiple punishments for the same offense."  Illinois v. Vitale, 447 U.S.

---

[3] The government asserts that this challenge was waived by the appellant's failure to attack the indictment prior to trial.  See Fed. R. Crim. P. 12(b)(3)(B).  We take no view on the waiver question.

410, 415 (1980) (quoting <u>North Carolina</u> v. <u>Pearce</u>, 395 U.S. 711, 717 (1969)).  When an indictment includes multiple counts charging a violation of the same statutory provision and a claim of multiplicity is raised, an inquiring court must determine whether the facts undergirding each count can be treated as a distinct unit of prosecution.  See <u>United States</u> v. <u>Hinkeldey</u>, 626 F.3d 1010, 1013 (8th Cir. 2010); <u>cf.</u> <u>United States</u> v. <u>LeMoure</u>, 474 F.3d 37, 43 (1st Cir. 2007) (observing, with respect to claim of multiplicity, that "[m]ultiple punishments for the same offense . . . are permissible if the legislature so intended").  "The critical inquiry is whether Congress intended to punish each statutory violation separately." <u>Jeffers</u> v. <u>United States</u>, 432 U.S. 137, 155 (1977).

Counts one and two both charged the appellant with attempted receipt of child pornography in violation of 18 U.S.C. § 2252(a)(2), which makes it unlawful to "knowingly receive[] . . . any visual depiction" involving "the use of a minor engaging in sexually explicit conduct."[4]  The record contains no evidence that might establish that the two files at issue here were received in separate and distinct transactions.  The government appears to concede that the allowable unit of prosecution for the appellant's

---

[4] Each count also mentions 18 U.S.C. § 2252(b)(1), which criminalizes the attempted violation of section 2252(a)(2).  This additional reference is of no consequence in the multiplicity analysis.

attempted receipt of videos containing child pornography, on a single day and without proof of multiple transactions, is one, not two. See United States v. Polouizzi, 564 F.3d 142, 158 (2d Cir. 2009) (concluding that the rule of lenity requires that a person who receives multiple prohibited images in a single transaction can only be charged with one violation under section 2252(a)(2)). Thus, there is a credible basis for a multiplicity claim.

The potential for such a claim dissipated, however, once the jury acquitted the appellant on count one and convicted him on count two. This split decision eliminated any prospect of double jeopardy. That makes a dispositive difference.

The appellant attempts to blunt the impact of this split decision by suggesting that, had the district court recognized the multiplicity concern when that concern was first voiced (at the close of the government's case in chief), the government would have been compelled to elect between counts one and two — and it might have guessed wrong as to which count it should jettison. This suggestion misses the mark.

There is no inflexible rule that the exclusive remedy for multiplicitous counts is election between them. See Ball v. United States, 470 U.S. 856, 864 (1985). Requiring election is one option, but not the only option; the court may, for example, simply vacate both the conviction and the sentence as to all but one count, essentially merging the offending counts. See, e.g., id.;

<u>United States</u> v. <u>Lilly</u>, 983 F.2d 300, 306 (1st Cir. 1992). This flexible approach makes good sense because "the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." <u>United States</u> v. <u>Josephberg</u>, 459 F.3d 350, 355 (2d Cir. 2006) (per curiam).

In the case at hand, the appellant was convicted and sentenced on only one of the two purportedly multiplicitous counts. Consequently, his rights under the Double Jeopardy Clause were not infracted. <u>See</u> <u>id.</u> That fact is fatal to the thesis that he advances here: a multiplicity claim is necessarily premised on double jeopardy concerns, and where such concerns have been eliminated, the multiplicity claim evaporates. The court below did not err in denying the appellant's motion for a new trial predicated on this ground.

## III.  CONCLUSION

We need go no further. For the reasons elucidated above, the appellant's challenges come to naught.


**<u>Affirmed</u>**.