# United States Court of Appeals
## For the First Circuit

No. 17-1445

UNITED STATES,

Appellee,

v.

DANIEL E. SAAD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Lynch, Thompson, and Barron
Circuit Judges.

Claire M. Specht, with whom Felicia H. Ellsworth and Wilmer
Cutler Pickering Hale and Dorr LLP were on brief, for appellant.
Donald Lockhart, with whom Stephen G. Dambruch, Acting United
States Attorney, was on brief, for appellee.

April 30, 2018

**LYNCH**, **Circuit Judge**.  Following a fourteen-day jury trial, Daniel E. Saad was convicted of arson, wire fraud, and the use of fire in furtherance of a federal felony.  Saad, who testified, appeals from these convictions, which stem from a November 30, 2014 fire that gutted Snow's Clam Box, a restaurant he owned in Glocester, Rhode Island.  He was sentenced to fifteen years in prison.

Saad's primary argument is that the prosecution violated his rights under the Confrontation Clause when an investigator testified that the cause of the fire was incendiary and not electrical.  Saad argues that the investigator relied on the conclusions drawn by Saad's insurer's electrical expert without calling that expert to the stand, where he could be cross-examined.  This also, he argues, was a violation of Federal Rule of Evidence 703.  The government argues in turn that Saad misreads the record and there was no error and, in any event, any possible error was harmless.  Saad also makes an unpreserved claim that statements by the prosecution in closing about the credibility of witnesses were inappropriate and warrant a new trial.

The supposed errors that Saad argues, whether individually or collectively, were harmless at most.  We affirm.

## I.  Facts

We recite the facts in the light most favorable to the jury verdict.  United States v. Van Horn, 277 F.3d 48, 50 (1st

Cir. 2002) (citing United States v. Escobar-de Jesus, 187 F.3d 148, 157 (1st Cir. 1999)).

A.  Background

Snow's Clam Box was located in Glocester, Rhode Island, about a forty minutes' drive from Saad's home in Spencer, Massachusetts.  Saad owned six other restaurants in addition to the Clam Box, all of which were located in Massachusetts.

Saad's financial situation was deteriorating in 2014. He owed almost $2.5 million to his creditors and his businesses were performing poorly, which caused him to make many loan payments late.  Paychecks to his employees bounced on multiple occasions, and vendors "refused to deliver goods to Snow's Clam Box until outstanding balances were paid."  Saad had thirty accounts spread across eight banks by the time of the fire, and he wrote checks on insufficient funds from one account to another in an attempt to stay current with his creditors.  As a result of this check-kiting, Saad overdrew his accounts 6,892 times between January 2011 and November 2014, incurring $198,851 in overdraft fees.

Saad also often pledged large portions of his restaurants' future credit card receivables in exchange for short-term, high-interest loans.  He sold $791,779 in receivables by this method, receiving $583,008 in funding.  Saad's many bank accounts had an aggregate balance of negative $9,043 at the time of the fire.

- 3 -

Saad had a $1 million insurance policy on the Clam Box, which covered $700,000 for the building, $150,000 for the contents, and $140,000 for lost income. He initiated a claim under that policy on the day of the fire.

B. <u>The Fire</u>

Tracey Smith, a tenant living above the Clam Box, testified that she was walking her dogs around 5:00 AM on November 30, 2014. While on the east side of the building, she heard the sound of a door closing on west side of the building. After she returned to her apartment, she heard movement in the restaurant downstairs, and the fire alarm went off. Smith smelled gasoline as she fled the building with her son and dogs. She had not noticed that smell while walking her dogs earlier. Once outside, Smith saw flames on the west side of the building and dialed 9-1-1 from her cellphone. Smith also called Saad twice, but he did not answer.

The fire department received notice of the fire at 5:23 AM. When the fire department arrived at the scene, the west side of the restaurant was engulfed in flames. The west side of the restaurant was severely damaged by the fire.

The Clam Box had security cameras, but the system's digital video recorder ("DVR") had been removed less than a week before the fire. Saad claimed that this was because the DVR was not functioning, but there was evidence that was not true. The

- 4 -

Clam Box also had a burglar alarm, but it was disabled at the time. Similarly, the doors to the restaurant had locks, but the basement door had been left unlocked that night.

C.   The Investigation

Deputy State Fire Marshal Paul Manning assembled an investigative team and the group divided up the necessary roles. Special Agent James Hartman from the Bureau of Alcohol, Firearms, Tobacco, and Explosives ("ATF"), a certified investigator, had responsibility for writing the "cause and origin" report expressing his opinion of how the fire started.   Manning was responsible for collecting evidence and documenting the scene with photographs and diagrams.   Kevin Murphy, a senior investigator from the Rhode Island State Fire Marshal's Office, was assigned to "examine the electrical systems . . . to help [the team] determine if it was possibly an accidental fire related to electricity." For the two days following the fire, Murphy reviewed the building's electrical features, such as circuit breakers and wiring, in search of any signs that the fire was caused by an electrical issue.   On December 5, Murphy continued his investigation with the help of Michael Rains, an employee for Saad's insurance carrier who had electrical expertise.   Murphy completed his review that day.

The investigators determined, based on the pattern of the fire damage along with other signs, that the fire had two origin points: the pellet stove area on the west side of the bar

and the floor on the east side of the bar. They ruled out many possible causes of the fire, including electrical fault, a gas leak, and a stove malfunction. The team collected and tested samples of debris "from the west side of the bar, which was adjacent to the pellet stove, inside the pellet stove, the east side of the bar, and the northeast side of the lounge near the restaurant area." Many of these tested positive for gasoline, including samples taken from the inside of the pellet stove and the area near the pellet stove.

D.  Cell Tower Evidence

The government obtained cell tower evidence showing that Saad, who lived forty minutes away from the Clam Box, had been less than two miles from the restaurant at 5:06 AM, just minutes before the fire. The same evidence showed that Saad was in the vicinity of the Clam Box at 5:25 AM, just after the fire started and before the fire department had arrived, and was moving away from it.

E.  Saad's Statements

Law enforcement officials interviewed Saad six times, from the day of the fire through March 6, 2015, and Saad's version of events changed dramatically over that time. On the day of the fire, Saad told investigators that the DVR had been removed because it was broken and would not record. Saad also stated that he "might have left [the basement door] open." He said he had closed

vents in the attic ducts, though an inspection revealed that that was untrue. Saad also stated that there was no reason why gasoline would be in the restaurant before the fire.

In a December 9, 2014 interview, Saad stated that he had been at home when he was notified of the fire. Saad recanted that story on January 7, 2015, admitting that he had misled investigators. He said, instead of being home at the time of the fire, he had been with his estranged wife at her home in Webster, Massachusetts. According to Saad, he and his wife spent the night together and then went for a drive to smoke marijuana at 4:35 AM. He said he had dropped her off and was driving back to his home in Spencer when his manager called him about the fire. Saad said that he had lied to investigators about his whereabouts because his children would have been very angry at him for being with his estranged wife. Saad repeated this story when he was interviewed on January 13, 2015.

Saad was interviewed again on March 6, 2015, this time on camera. Investigators confronted Saad with the evidence of gasoline in the pellet stove area and near the bar. Saad at first restated that he knew of no reason why gasoline would have been in the bar or pellet stove area. But he then changed his story, saying that he and others previously used gasoline to start the pellet stove and that he was unsurprised that there was gasoline near the stove. Saad downplayed this explanation when pressed by

investigators, saying he had only used a "little bit" of gasoline. When investigators told Saad that cell tower evidence showed he could not have been with his wife in Webster at the time of the fire, Saad stuck to his story that he had been with his wife. Saad's wife initially supported his alibi, but admitted before the grand jury that she had not been with Saad that night.

F.   The Trial

At trial, there was a great deal of testimony that Saad was responsible for the fire and had tried to cover up his involvement.  Saad's bookkeeper testified that Saad had left her multiple voicemails in the wake of the fire offering to hire a lawyer on her behalf and telling her to "keep [her]self out of this."  Those voicemails from Saad were admitted into evidence. She also stated that Saad had asked her before the fire to box up financial records.  She testified he also told her that "he was going to take [the records] home and say that they were lost in the fire, and he was going to destroy them."

In her testimony at trial, Saad's wife confessed that she had twice lied to investigators when she told them that Saad had been with her on the night of the fire.  She testified that Saad had asked her to provide a false alibi for him.

The prosecution put into evidence the cellphone and cell tower evidence discussed earlier.

There was also considerable evidence that the fire was incendiary and that gasoline was used to fuel it. Murphy testified to the methods used to determine whether a fire has an electrical cause, and how he had applied those methods to his three-day-long investigation. Murphy stated that he consulted with Rains and other members of the investigative team about whether the fire had an electrical cause. Murphy, when asked about his opinion as to the cause of the fire, stated, "Our opinion was -- my opinion was that none of the electrical activity or events that we documented or saw was the cause of the fire." (emphasis added). The defense did not object to this statement.

Hartman testified that there were irregular burn patterns in the restaurant's bar area, that gasoline was present on the west and east sides of the bar, and that there was a lack of fire damage in other areas. Hartman concluded, based primarily on this evidence, that the fire was caused by a person and that it began in the bar area where certain items had been "doused with an ignitable liquid."

Hartman testified that Rains, in addition to Murphy, had been "engaged to examine the electrical system." Hartman agreed that, "as part of [his] preparation for compiling an origin and cause report," he had reviewed and considered the report prepared

by Rains.[1]  The prosecution later asked Hartman whether there were any electrical conductors near the fire's two points of origin that could have caused the fire.  Hartman responded that there were conductors, junction boxes, and recessed lights in that area but that "[w]e looked at all those.  Mr. Rains ultimately looked at all those, and there was nothing there that we --."  This statement was interrupted by an objection from Saad's counsel, who stated that "[i]f they want to bring Mr. Rains in, they can."

The district court initially sustained the objection and called a bench conference with counsel.  The defense was concerned that Hartman was discussing Rains's conclusions without Rains testifying and that Rains's report did not even discuss whether the lights in the bar area could have caused the fire.  The district court ruled that Hartman could testify to the conclusions in Rains's report but could not discuss conclusions Rains reached that were not in the report.

Following the conference, the government did not ask about Rains's conclusions at all.  The government asked Hartman, "You had made a conclusion as it related to . . . existing electrical appliances and devices; is that correct?"  (emphasis added).  Hartman responded "Yes."  The government then asked, "And had you ruled those out as being an ignition source?"  (emphasis

---

[1]     The report was not introduced into evidence.

added). Hartman again answered, "Yes." On cross-examination, the defense did not question Hartman about the possibility of an electrical ignition source.

Justin Moseley, who was Saad's brother-in-law and the manager of the Clam Box, testified for the defense that he returned to the restaurant three days after the fire (that is, before December 5th) to inventory the items in the bar area. He said that the flashlights he brought with him did not provide enough light, so he returned with a 200-pound gas-powered generator, with which he planned to power construction lights in order to light the restaurant. Moseley said that the generator failed to start, so he drained some of its gas into a "chowder bowl." The generator still would not start, so he gave up. He then added something he had not told investigators. He said that, instead of taking the generator out through the west door of the restaurant, he had dragged the generator through the kitchen along the east side of the bar and hauled it down the stairs to the basement so that he could use the rear loading dock to get the generator into his vehicle. The government asked to treat Moseley as a hostile witness. The district court did not rule on that request in front of the jury, instead dismissing the jury for the day. After a brief discussion, the district court then ruled that the government could treat Moseley as an adverse party.

- 11 -

The next day, Moseley admitted, on examination by the government, that he had not dragged the generator along the east side of the bar and down the stairs to the basement. He said that he had been "confused" when he told that story and that, having reviewed his "notes," he remembered that he had left with the generator through the restaurant's west door.

The defense called Mark Kadlik, who had installed the security system at the Clam Box. While Kadlik confirmed that Saad had told him the DVR was broken and that Saad took it to Kadlik in the days before the fire, Kadlik also testified that the DVR was fully functional when Saad dropped it off.

Saad testified at trial, changing his story yet again from the statements he had made earlier. Faced with the cell tower evidence placing his cellphone near the restaurant at the time the fire started and with his wife's testimony that he had asked her to lie to investigators about his whereabouts, Saad for the first time stated that he had been at a lake near Snow's Clam Box -- many miles from his house -- attempting to commit suicide at the time of the fire. Saad confirmed many of the details about his financial status, but downplayed his comment to investigators that gasoline was often used to start the pellet stove, claiming he had only used gasoline once or twice. He asserted that the gasoline in the bar could have come from the gas-powered generator that Moseley claimed to have used in that area after the fire.

In closing argument, the prosecutor highlighted Saad's motive, his proximity to the scene of the fire, and testimony that Saad had asked others to lie on his behalf. The prosecutor discussed the inconsistencies in the testimony of Saad and his brother-in-law, Moseley. The government began its discussion of Moseley's testimony by saying, "Now, another piece of evidence that . . . has to be brought to the jury's attention is the testimony of Justin Moseley because have you ever seen a more unmitigated liar in your life than Justin Moseley who comes before you on day one and tells you this elaborate story?"

The prosecutor explained the problems with Moseley's claim that he dragged the gas-powered generator across the east side of the bar and then reminded the jury that Moseley recanted part of his story the next day. The government stated that Moseley "got up [on the witness stand] and perjured himself, and he removed himself from the perjury the next day by coming in saying oops, mistake, my bad."

The prosecutor called Saad's third alibi "incredible," and said, "I would suggest to you respectfully [that] it's an insult to your intelligence. The thought that he just happened to go next to his restaurant on the night that somebody sets it on fire to play Russian roulette or contemplate taking his life is ludicrous." The prosecutor continued that Saad was "a good storyteller" and "that story that he told you on the stand with

- 13 -

his weeping is malark[e]y, exactly like the two stories that he told the police before."  The prosecutor finally said, "I'd suggest to the jury [that Saad's story is] so incredible that it's hard to give it credence or respect."  The defense did not object at any point in the closing.

The defense's closing argument focused on highlighting the circumstantial nature of the government's case, downplaying the evidence of Saad's financial distress, arguing that evidence was mishandled, and giving reasons why Saad's final alibi was credible.  The defense questioned the evidence that gasoline was present at the scene of the fire and speculated that the fire could have started in the ceiling, but never argued that the fire was electrical.

The jury began deliberations on January 27, 2017.  It returned a guilty verdict later that day.

## II.  **Merits**

A.  Confrontation Clause

Saad argues that Hartman's testimony about whether the cause of the fire was electrical violated his Confrontation Clause rights because it introduced Rains's conclusions without having Rains testify.  See United States v. Cameron, 699 F.3d 621, 652 (1st Cir. 2012).  We need not determine whether Saad's Confrontation Clause rights were violated because, on these facts, any such violation, if one occurred at all, was "harmless beyond

a reasonable doubt." Id. We are more than satisfied that the government has shown that, even if there was an error, the jury would have found Saad guilty beyond a reasonable doubt. We explain why.

Saad argues that he was prejudiced because, given the circumstantial nature of the government's case, the evidence against Saad is severely weakened without Hartman's references to Rains's conclusions. In Saad's view, Hartman's references to Rains's conclusions were critical to establishing that the fire did not have an electrical cause, and that in turn helped the government show that the fire was not accidental.

The testimony in question only helped establish that the fire was not electrical in origin, a point that was not the subject of serious dispute at trial. Saad never argued that the fire was electrical, never directly challenged Hartman's conclusion on that point, and did not mention the issue in his closing argument. Even on appeal, Saad does not identify a shred of evidence that the fire was caused by an electrical source.

Saad's assumptions about the effect of the prosecution's failure to call Rains and about Hartman's supposed reliance on Rains ignore some important points. Independent of Hartman's testimony, Murphy testified that he ruled out the possibility that the fire had an electrical cause, and Saad does not challenge the admissibility of that testimony.

Hartman likewise testified about whether the cause of the fire was electrical. Saad thinks this testimony should be discounted because Hartman testified that Rains was brought in to provide additional expertise. But even if Rains was brought in "to assist [investigators] with making a better determination" about whether the fire had an electrical cause, that does not mean that Murphy and Hartman lacked the expertise to make their own determination.

Even if the jury understood Hartman's brief use of "we" as referring to Rains's conclusions for the purpose of determining whether the fire was electrical, "nothing material would have been added to the case." United States v. Godfrey, 787 F.3d 72, 78 (1st Cir. 2015). The government established that Saad had the motive, opportunity, and means to commit the crime, and that he was in the area to do so easily.

There is overwhelming evidence that the fire was started by Saad, who used gasoline to aid its spread. Gasoline was present in the pellet stove and elsewhere in the bar. Saad himself testified that there was no reason for gasoline to be in the bar, and yet it was there. Saad argues that Moseley's testimony shows that the samples could have tested positive for gasoline because a gas-powered generator was present in the bar after the fire, but at least one of the samples that tested positive was taken before the generator was in the bar, meaning gasoline was in the bar even

before Moseley purportedly brought in the generator.  In addition, Moseley never said he spilled gas from the generator into the bar.

The evidence of Saad's guilt was overwhelmingly strong for other reasons as well.  The jury heard Saad's testimony and heard him craft and then recant implausible alibis.  It heard him testify to his last explanation: that his straits led him to contemplate suicide at a lake near the site of the fire, but not to commit arson to collect the insurance proceeds.  It also heard testimony from his wife that he asked her to lie for him about crucial alibi testimony and testimony from his bookkeeper that he planned to burn financial records.  It also heard that he removed the DVR because he claimed it was broken, when that was not so.  And the cell tower evidence put him where he said he was not.

B.  Federal Rule of Evidence 703

For the same reasons, any error under Federal Rule of Evidence Rule 703 was harmless.  The parties dispute whether Saad's Rule 703 argument was preserved, but it is harmless even if he properly objected.  See United States v. Morosco, 822 F.3d 1, 18 (1st Cir.) ("'A non-constitutional evidentiary error is harmless' if 'it is highly probable' that the mistake 'did not influence the verdict.'" (quoting United States v. Piper, 298 F.3d 47, 56 (1st Cir. 2002))), cert. denied, 137 S. Ct. 251 (2016).

C.  Commentary on Witness Testimony

Saad argues, with some justification, that the prosecution's closing argument contained inappropriate and prejudicial statements about the credibility of Saad's and Moseley's testimony.  Saad argues that it was improper for the prosecution to, inter alia, label Saad as a "good storyteller," say that Saad's testimony was "malarkey," and call Saad's third alibi "an insult to [the jury's] intelligence."  Saad also takes issue with the prosecution calling Moseley an "unmitigated liar" and accusing him of perjury.

Our circuit said the following some time ago about similar comments by a prosecutor in closing argument: "[t]hat these statements were improper is so clear as not to brook serious discussion."  United States v. Rodriguez-Estrada, 877 F.2d 153, 158 (1st Cir. 1989); see also United States v. Nickens, 955 F.2d 112, 121 (1st Cir. 1992).  That is because a "prosecutor's obligation to desist from the use of pejorative language and inflammatory rhetoric is every bit as solemn as his obligation to attempt to bring the guilty to account."[2]  Rodriguez-Estrada, 877

---

[2]  We have never approved of a prosecutor calling defendants or defense witnesses liars, contrary to the government's characterization of Obershaw v. Lanman, 453 F.3d 56 (1st Cir. 2006).  Obershaw was a habeas petition from a state court conviction.  Id. at 57.  There, the prosecution had called the defendant a liar in its closing argument, and we had to determine whether the "prosecutor's comments . . . form[ed] a basis for habeas relief."  Id. at 66.  We held that they did not because,

- 18 -

F.2d at 159.  Such statements can threaten the fairness of a trial,
since, when a prosecutor "directly accus[es] a defendant of lying
. . . jurors could believe the government has knowledge outside
the evidence about the defendant's veracity."  United States v.
Garcia, 818 F.2d 136, 144 (1st Cir. 1987).

We recognize that different circuits more recently have
taken different views on a prosecutor accusing the defendant or
defense witnesses of lying.  Some circuits though have still noted
the word "liar" itself carries even greater risks.  See United
States v. Phillips, 704 F.3d 754, 767 (9th Cir. 2012) ("It is clear
that stating that the defendant lied by making a particular
statement is less problematic than calling him a liar in general,
since, in certain circumstances, the latter could have the tendency
to overtake the role of the jury as the arbiter of credibility.").
All circuits agree that the prejudicial effect of the prosecution's
use of "liar" in closing argument depends on context.  See United
States v. Moreland, 622 F.3d 1147, 1161-62 (9th Cir. 2010); United
States v. Stover, 474 F.3d 904, 916 (6th Cir. 2007); United States
v. Coriaty, 300 F.3d 244, 255 (2d Cir. 2002); United States v.
Shoff, 151 F.3d 889, 893 (8th Cir. 1998); United States v. Manos,

---

given the facts of that case, "it was reasonable [for the
Massachusetts Supreme Judicial Court] to view [the prosecutor's
comments] as comments based on the evidence."  Id.  We did not
hold that the prosecutor's statements were proper.

848 F.2d 1427, 1436-37 (7th Cir. 1988); Houston v. Estelle, 569 F.2d 372, 383 (5th Cir. 1978).

The government, at oral argument, asked us to bless the use of the term "liar." Times change, but we do not condone the use of that term. As the Fourth Circuit has said:

> When a prosecutor comments on the veracity of a witness, the prosecutor's statement presents two discrete risks: (1) of improperly suggesting to the jury that the prosecutor's personal opinion has evidentiary weight; and (2) of improperly inviting the jury to infer that the prosecutor "had access to extra-judicial information, not available to the jury."
>
> The gravity of these risks is amplified in the case of a criminal defendant exercising his constitutional right to testify in his own defense.

United States v. Woods, 710 F.3d 195, 203 (4th Cir. 2013) (citations omitted) (quoting United States v. Moore, 710 F.2d 157, 159 (4th Cir. 1983)).

We also agree with the reservations expressed by the Third Circuit in Fahy v. Horn, 516 F.3d 169 (3d Cir. 2008): "[i]f a defendant testifies on his own behalf . . . a prosecutor may attack his credibility to the same extent as any other witness. This does not mean, however, that a prosecutor may express his personal belief in the credibility of a witness or the guilt of a defendant." Id. at 203 (citations omitted).

- 20 -

The defendant argues on appeal that the prosecutor went beyond fair commentary on the evidence and so prejudiced him as to violate his due process rights. See United States v. Francis, 170 F.3d 546, 552-53 (6th Cir. 1999) (granting new trial based on prosecution improperly calling the defendant a liar numerous times). Saad argues the statements were prejudicial because they pervaded the prosecutor's closing argument, the statements were targeted at key witnesses, and the government's case was circumstantial and weak.

Saad did not object to the statements before the district court, so we review for plain error. United States v. Pires, 642 F.3d 1, 14 (1st Cir. 2011). Under this demanding standard of review, Saad must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). Even if we were to assume that prongs (1) and (2) were met, Saad fails the third and fourth prongs of plain error review because he cannot establish "a reasonable likelihood that the result would have been different without the challenged comments." United States v. De La Paz-Rentas, 613 F.3d 18, 27 (1st Cir. 2010).

Reviewing the government's case as a whole, we are satisfied that, despite Saad's arguments, the result would not

- 21 -

have been different absent the prosecutor's inappropriate comments. In addition to the evidence against Saad being overwhelming, the prosecutor's statements criticizing the witnesses' credibility were based on the inconsistency and outlandishness of their stories, making it less likely that the jury would infer that the prosecutor had "private knowledge of the defendant's guilt that unfortunately cannot be shared with the jury." United States v. Gomes, 642 F.3d 43, 47 (1st Cir. 2011). While this absence does not mean that the prosecutor's comments were appropriate, it makes it less likely that the comments were prejudicial.

Importantly, the district court's jury instructions made it clear that the jurors were to make their own credibility determinations, despite the defense's failure to object to the prosecution's statements. We presume that the jury followed those instructions. United States v. Spencer, 873 F.3d 1, 16 (1st Cir. 2017) (citing United States v. Ponzo, 853 F.3d 558, 584 (1st Cir. 2017)). The jury "had ample opportunity to draw its own conclusions about the witness[es'] veracity, given that it saw and heard [them] testify" at length. United States v. Rodriguez-Adorno, 695 F.3d 32, 41 (1st Cir. 2012).

## III. Conclusion

We affirm Saad's conviction.