# United States Court of Appeals
## For the First Circuit

No. 20-1366

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ O. CINTRÓN-ORTIZ, a/k/a Chelo,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

---

Before

Barron, Chief Judge,
Howard and Thompson, Circuit Judges.

---

Kevin E. Lerman, Research & Writing Specialist, with whom Eric Alexander Vos, Federal Public Defender, and Franco L. Pérez-Redondo, Assistant Federal Public Defender, Supervisor, Appeals Division, were on brief, for appellant.

Natasha K. Harnwell-Davis, Attorney, Criminal Division, United States Department of Justice, with whom W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Thomas F. Klumper, Assistant United States Attorney, Senior Appellate Counsel, were on brief, for appellee.

---

May 16, 2022

---

**BARRON**, <u>Chief Judge</u>.  José Cintrón-Ortiz ("Cintrón") challenges the finding by the United States District Court for the District of Puerto Rico that he violated the conditions of his supervised release term and the length of his revocation sentence. We affirm.

## I.

Cintrón was charged on December 12, 2005, with participation in a conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841 and 846.  Cintrón pleaded guilty and, on December 7, 2006, was sentenced to a 120-month term of imprisonment to be followed by a 60-month term of supervised release.

The conditions of Cintrón's supervised release required him to, among other things, "not commit another federal, state or local crime," and "not possess a firearm, ammunition, destructive device, or any other dangerous weapon."  The United States Probation Office for the District of Puerto Rico ("Probation") on November 14, 2019, filed a letter with the District Court that requested a warrant for Cintrón's arrest because it had "received credible information that [Cintrón was a] target of an investigation from Puerto Rico Police involving possession and use of [a] firearm" in violation of the conditions of his supervised release.

Seven days later, Probation requested that the District Court conduct a hearing regarding the revocation of Cintrón's supervised release. The request asserted that Cintrón "was suspected of having been in possession of a firearm on October 27, 2019 [at El Pajú,] a local business in Salinas, Puerto Rico." It added that Alexandria Oliveras-Rivera, the Probation Officer responsible for supervising Cintrón during his supervised release term, "interviewed the [Puerto Rico] case agent [responsible for investigating the October 27 incident], observed evidence (security video), and identified Mr. Ortiz-Cintron [sic] from the security video. In addition, she observed him assaulting a citizen and shooting a firearm."

The District Court issued a warrant for Cintrón's arrest. It then held a preliminary revocation hearing on December 11, 2019, followed by a final revocation hearing on March 13, 2020.

At the final revocation hearing, the government presented testimony from Carlos León-Vázquez, a Puerto Rico police detective tasked with investigating the October 27 incident. Cintrón objected to Detective León's testimony on the ground that it was based on interviews that Detective León had conducted with third party witnesses who were not present for the revocation hearing. Cintrón contended that he had a limited right to confront those witnesses under the Due Process Clause of the Fifth Amendment to the U.S. Constitution and Federal Rule of Criminal Procedure

- 3 -

32.1(b)(2)(C) and that it would violate that right to permit Detective León to testify based on what he had learned from them.

The District Court questioned the government as to why those witnesses were not present at the hearing. The government responded that they "ha[d] fled the country out of fear [of] the Defendant." Without further inquiry of the government, the District Court permitted Detective León to testify based on what the witnesses had supposedly related to him on the ground that "the interest of justice, these victims being outside of the jurisdiction, d[id] not require them to appear."

Detective León proceeded to testify that, as part of his investigation, he had interviewed "seven or eight" witnesses, including four victims of Cintrón's alleged conduct. He also testified that he had obtained contemporaneous surveillance camera footage from El Pajú and that he was able to identify Cintrón in the footage based on his knowledge of Cintrón's appearance from past interactions with him.

Detective León testified that he could observe Cintrón in that footage proceed from the bar area of El Pajú and approach "Morales" (the ex-husband of Cintrón's then-girlfriend), Morales's daughters, and Morales's girlfriend. According to Detective León, he could further observe Cintrón in that footage punch Morales. He also testified that he could see from the footage "Minino," an alleged accomplice of Cintrón, thereafter "take[] out a firearm,

- 4 -

a weapon, and be[gin] shooting," "shoot[ing] without looking," towards Morales and Morales's daughters and girlfriend. He further explained that the footage also showed Cintrón take out a "weapon . . . from the rear part of his waist," point it towards Morales and his group, and fire. Detective León also testified that he had collected two types of shell casings from El Pajú and took photos of several horses that were injured during the incident.

The government also presented testimony from Oliveras at the final revocation hearing, including with respect to what she observed from the footage taken from the video surveillance cameras at El Pajú on the night in question. Oliveras testified that she also could identify Cintrón in that footage based on what it depicted and her previous experience supervising him while he was on supervised release. Oliveras then proceeded to testify as to how she tracked Cintrón's movement in that footage from the bar area of El Pajú to the area where Morales was located, and how she observed Cintrón discharge a firearm once in that area.

Cintrón again raised in his closing argument at the final revocation hearing an objection to the portions of Detective León's testimony that he contended were based on statements from the witnesses whom Cintrón was not able to confront. He also contended that the surveillance camera footage did not show by a preponderance of the evidence that he had discharged (or even possessed) a firearm during the incident at El Pajú and that "the

only thing the Court [had] to corroborate that it was Mr. Cintron" who discharged a firearm was "testimony from [Detective León], from conversations he had with other people, who [Cintrón did not] have the ability to confront."

The District Court found that Cintrón committed a Grade A violation of his supervised release. See U.S.S.G. § 7B1.1(a)(1) (describing a Grade A violation of supervised release as "conduct constituting . . . a federal, state, or local offense punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a)"). On that ground, the District Court revoked Cintrón's supervised release. Id. § 7B1.3(a)(1) ("Upon a finding of a Grade A . . . violation, the court shall revoke probation or supervised release." (emphasis added)). The District Court sentenced Cintrón to a 60-month term of imprisonment to be followed by a 36-month term of supervised release. In addition, the District Court determined that for the first six months of Cintrón's supervised release term, he would be required to "remain under curfew at his residence of record from 6:00 p.m. to 6:00 a.m. . . . except for employment or other activities approved of in advance by the probation officer."

Cintrón timely appealed.

- 6 -

The defendant in a supervised release revocation hearing enjoys a limited right to confront adverse witnesses both under Rule 32.1(b)(2)(C), which provides that a defendant in a revocation proceeding may "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear," and the Due Process Clause of the Fifth Amendment. See Morrissey v. Brewer, 408 U.S. 471, 489 (1972) (holding that constitutional due process requires that a defendant in a parole revocation proceeding have "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)"); United States v. Rondeau, 430 F.3d 44, 48 (1st Cir. 2005) (acknowledging that a defendant in a supervised release revocation proceeding has "a limited confrontation right under Fed. R. Crim. P. 32.1(b)(2)(C)").[1]  Cintrón contends that the District Court erred in revoking his supervised release term because its finding that he had committed a Grade A violation relied in part on testimony from Detective León that was based on interviews with

---

[1]  We have previously explained that the defendant in a supervised release revocation proceeding does not enjoy the right to cross-examine witnesses that is provided in the Confrontation Clause of the Sixth Amendment.  See Rondeau, 430 F.3d at 47-48.

people who were not present at the revocation hearing and so were not available for confrontation and cross-examination by him.[2]

In pressing this challenge under Rule 32.1 and the Due Process Clause of the Fifth Amendment, Cintrón further contends that the government's proffered reason for the absence of the witnesses in question was inadequate to support a finding that the "interest of justice d[id] not require the witness[es] to appear." See, e.g., Rondeau, 430 F.3d at 48 (noting that, when determining whether to admit hearsay testimony under Rule 32.1(b)(2)(C), "a court should consider . . . the government's reason for declining to produce the declarant").  He also contends that the portions of Detective León's testimony that relied on the statements from those witnesses lacked sufficient indicia of reliability, and thus that, given the absence of the witnesses in question, the District Court could not rely on that testimony.  See, e.g., United States v. Taveras, 380 F.3d 532, 538 (1st Cir. 2004) (concluding that, "[g]iven the unreliable nature of [the witness's] hearsay

---

[2]   We note that Cintrón does not present the admission of León's hearsay statements as providing a basis for challenging the length of the sentence that he received from the District Court for violating the conditions of his supervised release. Cf. United States v. Torres-Santana, 991 F.3d 257, 265 (1st Cir. 2021) (considering without resolving whether a defendant is entitled to the limited confrontation right set forth in Rule 32.1 with respect to the sentencing phase of a revocation proceeding).

testimony . . . the 'interest of justice' did not justify the district court's admission of hearsay testimony").

The government responds that there was no violation of either Rule 32.1 or the Fifth Amendment because the District Court's finding that the government had good cause for introducing the testimony from Detective León was well supported by the government's proffer that the witnesses were outside of the jurisdiction on account of their fear of Cintrón.  See, e.g., United States v. Bueno-Beltrán, 857 F.3d 65, 68 (1st Cir. 2017) (per curiam).  In addition, the government contends that there was no Rule 32.1 or Fifth Amendment violation because the record shows that the testimony at issue had the requisite indicia of reliability.  See, e.g., United States v. Fontanez, 845 F.3d 439, 443 (1st Cir. 2017).

We need not resolve this dispute.  Even if we were to assume that the admission of the testimony violated Cintrón's limited confrontation right under either Rule 32.1 or the Fifth Amendment, we agree with the government that any such error was harmless on this record.

Detective León's challenged testimony aside, the record includes the surveillance camera footage.  When combined with other evidence in the record that Cintrón does not challenge, it strongly supports the Grade A-violation finding that the District Court made.

Specifically, the surveillance footage shows several individuals in the bar area of El Pajú on the relevant night. Among them is a man who can clearly be seen holding a drink and dressed in blue short jeans, a black T-shirt, a black cap, and wearing black tennis shoes. The footage then shows that man leaving the bar area, at which point footage from another camera shows a man in the same clothing of a seemingly identical build walking towards a vehicle, approaching an individual wearing a white shirt, and engaging that individual in conversation.

The footage from that second camera then goes on to show that same man and the individual proceeding towards a group that is congregated near a gate, the individual pulling out what appears to be a firearm from his person, and discharging it. Finally, the footage from that camera shows the man accompanying the individual immediately thereafter holding what appears to be a firearm of his own and raising that firearm in the air. Smoke and a flash of some sort then appears to emanate from that firearm.

To be sure, this footage does not itself provide a basis for concluding that the man in the blue shorts at the bar was Cintrón. But, in addition to the surveillance footage, the government introduced testimony from Detective León that he had prior knowledge of what Cintrón looked like based on earlier investigations of him and that based on that prior knowledge he

was able to identify Cintrón in the footage as the man in the blue shorts at the bar.

In addition, the government introduced testimony from Oliveras, who testified that she was responsible for supervising Cintrón and so interacted with him on numerous occasions. And she, too, testified that, based on her prior interactions with Cintrón, she could identify him as the man in the blue shorts who proceeded from the bar and eventually discharged a firearm right after the individual who was accompanying him had done so. It is worth quoting Oliveras's testimony about her own observations of what the surveillance footage reveals more fully, as those observations accord with our own assessment of what that video footage depicts:

> Oliveras: Okay. So I initially see [Cintrón] walking from the bar, walking in front the SUV where the man with the white shirt is at. He briefly speaks something, because I see the man in the white shirt walking with him. They walked towards the gate.
>
> I am able to follow [] Cintron [sic] through his clothing. I see him and still [am] able to see him behind the leaves of the trees. I see him walking towards where the horses were at.
>
> I do see the person with the white shirt fire. Regardless of him firing, I am still able to follow [] Cintron [sic] through his black shirt.
>
> I actually see him reach with his left hand towards his waistband, at the back of his -- waistband towards the back, pull something

- 11 -

out, and actually transfer something to his right hand, raise his hand and shoot, because I do see a white powder light.

Government:  Like a sparkle?

Oliveras:  Correct.

Government:  And you see that sparkle from this camera angle that I am showing in Government's Exhibit 8E?

Oliveras:  Yes.

Government: Okay.  And who is the person who is transferring that thing you just said from the left to the right hand?

Oliveras:  [] Cintron [sic], my client.

Simply put, this collection of evidence in and of itself provides overwhelming support for the finding by the District Court that a preponderance of the evidence showed that Cintrón violated the conditions of his supervised release term by possessing a firearm.  See United States v. Rodriguez, 919 F.3d 629, 636-37 (1st Cir. 2019) (determining that although the District Court erred in admitting hearsay testimony, that testimony did not contribute significantly to the District Court's finding that the defendant violated the conditions of his supervised release and that, as a result, the District Court's error was harmless); Fontanez, 845 F.3d at 445 (same); accord United States v. Mosley, 759 F.3d 664, 669 (7th Cir. 2014) ("[E]ven where a proper balancing of the interests would weigh in favor of excluding hearsay, its erroneous admission may still be harmless for the alternate reason that the

- 12 -

violation of supervised release would have been found without the hearsay evidence."); United States v. Frazier, 26 F.3d 110, 114 (11th Cir. 1994) ("[W]e find the error to be harmless because the properly considered evidence overwhelmingly demonstrated that [the defendant] breached the terms of his supervised release.").  Nor does Cintrón persuasively argue to the contrary.

Cintrón does argue that the video footage just described was "not [of] identification quality" and only "showed an obscured, crowded area where individual features could not be distinguished."  But, that characterization of the footage is fair only so far as it goes.  In particular, it does not account for the fact that the footage plainly shows not only the face of the man at the bar whom Detective León and Oliveras each identified as being Cintrón but also identifying features of that same person that perfectly match those of the person that the footage then shows to be discharging a firearm.

Cintrón also emphasizes that the testimony from Detective León that gives rise to the asserted violation of Rule 32.1 and the Due Process Clause of the Fifth Amendment preceded the government's presentation of the surveillance video footage and any testimony pertaining to Detective León's or Oliveras's personal observations of that footage.  Cintrón argues that fact is significant because it supports his assertion that the objectionable testimony from Detective León had the effect of

"fill[ing] in a narrative visible nowhere in the record: that the person [who was] shot ([Morales]) was in a love triangle with Mr. Cintrón's girlfriend . . . and [that] Mr. Cintrón was 'at odds' with [Morales]."

Cintrón does not explain, however, how that "narrative" pertains to the testimony by Detective León and Oliveras that each was able to identify Cintrón in the footage from past encounters with him as the man at the bar and that each was then able to track that man's movements in the footage and thereby identify him possessing and discharging a firearm. Thus, Cintrón does not explain how that "narrative" has any bearing on the narrow issue that is our concern: whether the introduction of the portions of Detective León's testimony that Cintrón contends were based on what he had heard from the witnesses that Cintrón could not confront was harmless in light of the other evidence in the record that supported the District Court's finding that Cintrón committed a Grade A violation of his supervised release by being a felon in possession of a firearm. Thus, we reject Cintrón's challenges to the District Court's revocation ruling insofar as those challenges are based on either Rule 32.1 or the Fifth Amendment.

## III.

Cintrón separately contends that his revocation sentence cannot stand on the ground that it exceeds the maximum imprisonment term allowed by statute and is therefore unlawful. Cintrón brings

- 14 -

this contention for the first time on appeal. Our review, therefore, is for plain error. See United States v. Márquez-García, 862 F.3d 143, 145 (1st Cir. 2017).

"To vault the formidable hurdle imposed by plain error review, an appellant must show '(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [appellant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.'" Id. (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). Cintrón has failed to make that showing because he has failed to show that the District Court clearly or obviously erred in imposing the sentence that it did.

After finding that Cintrón had committed a Grade A violation of supervised release, the District Court sentenced him to five years in prison and three years of supervised release pursuant to its authority under 18 U.S.C. § 3583(e) & (h). In addition, the District Court imposed the following supervised release condition on Cintrón requiring that he

> [R]emain under curfew at his residence of record from 6:00 p.m. to 6:00 a.m. for a period of six months to commence upon his release from imprisonment. During this time, he shall remain in his residence, except for employment or other activities approved in advance by the probation officer. He shall wear an electronic device 24 hours a day and shall observe the rules specified by the probation officer.

Cintrón contends (1) that the condition that the District Court imposed is a requirement that he "remain at his place of residence during nonworking hours," 18 U.S.C. § 3563(b)(19); (2) that such a condition "may only be imposed as an alternative to incarceration," id. (emphasis added); and (3) that because that condition "may be imposed only as an alternative to incarceration," it is equivalent to imprisonment, such that the imposition of that condition in addition to a prison sentence of five years for his Grade A violation of the conditions of his term of supervised release resulted in a term of imprisonment for that violation in excess of five years. Thus, Cintrón contends that the District Court imposed a revocation sentence that exceeded the statutory maximum because 18 U.S.C. § 3583(e)(3) makes clear that no prison sentence of more than five years may be imposed upon revocation of a supervised release term when the offense that led to the initial term of supervised release is a Class A felony.

Cintrón's challenge presents two questions of law. The first is whether the supervised release condition imposed by the District Court is in fact the condition to which § 3563(b)(19) refers, i.e., home confinement. See United States v. Lopez-Pastrana, 889 F.3d 13, 19 (1st Cir. 2018). The second is whether, even if it is, it is equivalent to imprisonment, such that its imposition resulted in Cintrón having received a term of

imprisonment for violating the conditions of his supervised release that exceeds five years.

As we will explain, even if we were to assume that the supervised release condition the District Court did impose is the supervised release condition set forth in § 3563(b)(19), Cintrón cannot show that the District Court plainly erred in imposing the sentence that it did. And that is because it is not "clear or obvious" that such a condition constitutes "imprisonment" for purposes of the statutory maximum term of imprisonment set forth in § 3583(e)(3).

The statutory text does not plainly show that such a condition constitutes imprisonment. Compare United States v. Ferguson, 369 F.3d 847, 851 (5th Cir. 2004) (per curiam) (concluding that home confinement and incarceration are equivalent because the operative term "alternative" indicates "a proposition or situation offering a choice between two things wherein if one thing is chosen the other is rejected" (quoting Webster's Third New International Dictionary 63 (1961))), with United States v. Hager, 288 F.3d 136, 138 (4th Cir. 2002) (concluding that home confinement and incarceration are not equivalent because the use of the term "alternative" indicates that home confinement and incarceration are "mutually exclusive" and therefore not the same (quoting The Random House Dictionary of the English Language 61 (2d ed. 1987))). Nor does either our controlling precedent, cf.

United States v. Ríos-Rivera, 913 F.3d 38, 43 (1st Cir. 2019) ("For an error to be clear and obvious, we require an 'indisputable error by the judge given controlling precedent.'" (quoting United States v. Morosco, 822 F.3d 1, 21 (1st Cir. 2016)),[3] or precedent from other circuits. Compare Ferguson, 369 F.3d at 851 (holding that "a court could not impose both a term of incarceration (upon revocation of supervised release) and subsequent home detention during a reimposed term of supervised release that, when combined, exceeds the allowable maximum incarceration term"), with Hager, 288 F.3d at 138 (finding that "[h]ome confinement in this case is more properly viewed as a condition of supervised release" and is "not the equivalent of incarceration"), and United States v. Polydore, 493 F. App'x 496, 499 (5th Cir. 2012) (per curiam) (declining to extend its prior decision in Ferguson when addressing the question of whether a "previously imposed term of home

---

[3] We did state in United States v. Marcano, 525 F.3d 72 (1st Cir. 2008) (per curiam), that Congress may have intended in enacting § 3563(b)(19) that a supervised release condition requiring that a defendant "remain at his place of residence during nonworking hours" be understood to be the equivalent of incarceration, see id. at 73-74. But, we did not determine there that Congress did so intend, as we instead concluded only that the defendant's "total period of imprisonment . . . plus the ensuing period of home confinement" did not exceed the relevant statutory maximum in any event. Id. Similarly, in Lopez-Pastrana, we stated that "home confinement is a 'unique' condition of release, permissible only as a stand-in for imprisonment," 889 F.3d at 19, but only in attempting to discern whether a defendant understood home confinement to be encompassed by the scope of his plea agreement's appellate waiver.

detention is a term of imprisonment for purposes of determining the maximum term of supervised release that may be imposed following a subsequent revocation"); cf. United States v. Crocco, 15 F.4th 20, 24 (1st Cir. 2021) ("As a general principle, if a question of law is unsettled in this circuit, and a conflict exists among other circuits, any error in resolving the question will not be 'plain or obvious.'").  Accordingly, we agree with the government that Cintrón has failed to show that the District Court clearly or obviously erred in imposing the revocation sentence that it did.

**IV.**

**Affirmed**.